# United States Court of Appeals
## For the First Circuit

Nos. 01-1984

GINA MARRERO,

Plaintiff, Appellee,

v.

GOYA OF PUERTO RICO, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gilberto Gierbolini-Ortiz, Senior U.S. District Judge]

Before

Boudin, Chief Judge,
Selya and Lipez, Circuit Judges.

Radamés A. Torruella, with whom Maggie Correa-Avilés and McConnell Valdes were on brief, for appellant.

José F. Quetglas for appellee.

August 28, 2002

**LIPEZ**, **Circuit Judge**. Gina Marrero filed this employment discrimination action against her former employer, Goya of Puerto Rico, Inc. (Goya), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Marrero alleged that sexual harassment by her former supervisor, Ramón Cárdenas, created a hostile work environment; that Goya retaliated against her when she complained about Cárdenas's behavior; and that, as a result of the retaliation and continuing harassment, she was forced to resign. She sought compensatory damages, back pay, and punitive damages.

The case proceeded to trial, and at the close of the evidence Goya moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. Goya argued, first, that much of the alleged harassment fell outside Title VII's statute of limitations, leaving events within the limitations period that did not rise to the level of a hostile work environment. Second, Goya maintained that the evidence was insufficient as a matter of law to support Marrero's claims of retaliation and constructive discharge, and her request for punitive damages. Finally, it urged the court to enter judgment in its favor on the basis of the affirmative defense recognized in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), for cases involving sexual harassment by a supervisor.

The district court deferred judgment on the motion and submitted the case to the jury. After several hours of deliberations, the jury returned a verdict in Marrero's favor, awarding her $175,000 in compensatory damages, $11,250 in back pay,

-2-

and $75,000 in punitive damages. Goya duly renewed its Rule 50 motion for judgment as a matter of law or, in the alternative, a new trial. This time, the district court rejected the motion, concluding that Goya had forfeited the statute of limitations defense; that there was ample evidence to support the jury's findings of a hostile work environment and retaliation, its award of back pay for constructive discharge, and the punitive damages; and that the jury reasonably concluded that Goya had not established the elements of the Faragher/Ellerth affirmative defense.

We review de novo the court's denial of Goya's motion for judgment as a matter of law. White v. N.H. Dep't of Corrections, 221 F.3d 254, 259 (1st Cir. 2000). Like the district court, we examine the evidence presented at trial in the light most favorable to Marrero. Id. We "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996) (internal quotation marks omitted). We must affirm unless "reasonable persons could not have reached the conclusion that the jury embraced." Negron-Rivera v. Rivera-Claudio, 204 F.3d 287, 290 (1st Cir. 2000). We review the district court's denial of Goya's request for a new trial for an abuse of discretion, recognizing that "[a] new trial should be ordered only if the court believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of

justice." Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999) (internal quotation marks and alterations omitted).

We conclude that Marrero's hostile work environment claim was supported by sufficient evidence and was not barred by the statute of limitations. We also conclude that Goya was not entitled to judgment as a matter of law on the Faragher/Ellerth affirmative defense, or the issue of constructive discharge. However, we hold that the district court erred in accepting the verdict for Marrero on her claim of retaliation. Because it is impossible to determine what portion (if any) of the compensatory and punitive damages awards was based on the jury's erroneous finding of retaliation, we remand for a new trial on damages.

## I.  BACKGROUND

The jury could have found the following facts.[1] Marrero began work at Goya in April of 1995, where she served as a secretary in the Sales Department, under the supervision of Ramón Cárdenas, the Vice President for sales. Marrero also had duties in the Exports Department, where her supervisor was Wilberto Rivera and -- later -- José Luis Diaz.

Marrero was subjected to sexual harassment by Cárdenas throughout her tenure at Goya. The harassment consisted primarily of sexual comments, often accompanied by lascivious looks and offensive gestures. Cárdenas also would contrive to "bump into" Marrero in the narrow hallway between their work spaces, and on

---

[1] We provide a sense of the case here. We provide more detail in the relevant sections of the opinion.

-4-

several occasions rubbed his body against hers as she used the photocopier machine.

In the summer of 1995, Marrero confronted Cárdenas about his behavior. After a brief respite, the harassment began again, now accompanied by more "vulgar" comments made "with a gross tone." In addition, Cárdenas began to criticize Marrero for work-related matters. He would scold her for no reason, sometimes yelling at her in front of other employees. On other occasions Cárdenas would startle Marrero by slapping her desk with his fist; he then would ask, "Aren't you tough? Are you scared?"

Cárdenas also used his authority to "punish" Marrero in several ways. He often gave her extra work just as she was leaving for the day, making her stay extra hours without pay for overtime. Although he was aware that she was hypoglycemic, Cárdenas changed Marrero's lunch hour so that she was forced to work for more than five hours without a break. He also used his power in more petty ways, such as refusing Marrero's requests to leave her desk to use the bathroom.

Cárdenas's conduct made Marrero feel "offended, humiliated, embarrassed, depressed." By the fall of 1995, she had become "very anxious, very nervous" at work. Marrero had difficulty concentrating; she "had to make a super-human effort" in order to perform her duties.

In December of 1995, Marrero suffered a nervous breakdown. She "couldn't function the way [she] was feeling." Her family physician prescribed antidepressants and tranquilizers, and

referred her to a psychiatrist, Dr. Fernando Cabrera. Marrero met with Dr. Cabrera several times during December, 1995, and January, 1996. During her first visit, she mentioned that Cárdenas was bothering and pressuring her at work, but she did not provide any details. Dr. Cabrera described Marrero as "disorganized, confused, and unable to talk in a coherent and logical way" about what was bothering her. He diagnosed a major depression with psychotic features and a panic disorder, and recommended that Marrero take a five-week medical leave from work. During that time, he treated her aggressively with antidepressants, tranquilizers, and anti-psychotic drugs.

Marrero returned to work on February 5, 1996. She did not feel that she had recovered fully, but "needed the money" from work. She was greeted by more of the same harassment by Cárdenas. He continued to make sexual comments, and "was always getting on [Marrero's] case."

Eventually, the situation "became intolerable," and on August 15, 1996, Marrero suffered another emotional breakdown. She was taken by a Goya nurse to the emergency ward of a psychiatric hospital, and from there to Dr. Cabrera's office. Marrero told Dr. Cabrera "I cannot work anymore" and that Cárdenas was "making her feel bad." Dr. Cabrera interviewed the Goya nurse, who confirmed that it "was true, that [Marrero] was being harassed by . . . Mr. Cárdenas." Dr. Cabrera issued a medical certificate to Goya excusing Marrero from work for two weeks. The certificate stated

that Marrero was suffering from "depression and anxiety caused by work."

Marrero returned to work after two weeks of sick leave. Again, she was subjected to continuing harassment by Cárdenas, culminating in the events of October 31, 1996. Cárdenas told Marrero that he was going out to buy Halloween presents. He gave her "a direct penetrating look with lust," and said: "I have a little present for you that you're never going to forget and if you don't do the things I tell you and order you to do I am going to fire you." Marrero interpreted that comment as a sexual invitation, and a threat that if she did not submit, she would be fired.

Marrero immediately reported the incident to Diaz (her supervisor in the Exports Department). Marrero had discussed Cárdenas's behavior with Diaz previously, as she had with his predecessor, Rivera. She also had complained to Remigio Nieves, the Vice President of the Human Resources Department. Following the "Halloween presents" incident, Marrero sent a memo to Nieves, requesting a copy of Goya's policy on discrimination and harassment. When Nieves did not respond, Marrero decided to seek advice from the Department of Labor for the Commonwealth of Puerto Rico. She met with Nieves several days later and informed him that she planned to file a formal grievance.

Marrero went on sick leave from November 13 to 20, 1996. During that time, she filed a charge of sexual harassment with the

Equal Employment Opportunity Commission (EEOC) against Cárdenas and Goya.  She also retained legal counsel.

Marrero returned to work on Wednesday, November 20.  That morning, she met with Nieves and Goya's in-house counsel, Horacio Cabrera.  The three discussed Marrero's problems with Cárdenas, and Marrero confirmed that she had filed a charge with the EEOC. Nieves then handed her a letter stating that she had been transferred to the Human Resources Department, where she would serve as his secretary.  In that job, Marrero would no longer be under Cárdenas's direct supervision; however, her new desk would be approximately the same distance from Cárdenas's office as her original location.  She asked Nieves why she could not be transferred to an available secretarial position in another building, away from Cárdenas.  Nieves responded that the decision had been made; he urged her to view the transfer as a promotion.

In her new position as Nieves's secretary, Marrero would perform largely the same duties as she had as secretary for the Sales and Exports Departments.  Nevertheless, Nieves told her that she would have to undergo a probationary period "to see whether [she] could perform the new duties."  Marrero viewed the probationary period as a threat to her job security.

Marrero remained at the new position for the final two days of the work week.  She was trained by Maritza Ramos, secretary to the President of Goya.  Marrero felt threatened by Ramos, who -- together with Nieves -- subjected her to "extreme supervision." Moreover, Cárdenas continued to bother Marrero in her new position.

He stared at her, made faces, and laughed at her. At one point he said, "[you] thought [I] was going to be screwed," but "it was [you] who ended up screwed."

As a result of the continuing harassment and the hostility she felt in her new job, and acting on advice from Dr. Cabrera, Marrero did not return to work after Friday, November 22. She hoped that she would be able to go back to Goya once her emotional condition improved. However, by March of 1997 -- after continuous psychiatric treatment, and on the recommendation of Dr. Cabrera -- Marrero decided she had no choice but to resign. She gave notice of her retirement on March 24, 1997. Shortly thereafter, she filed a second charge with the EEOC alleging retaliation and constructive discharge.

## II.  HOSTILE WORK ENVIRONMENT

Marrero's complaint alleged, inter alia, that the constant sexual harassment by Cárdenas created a hostile work environment actionable under Title VII. In order to prevail on that claim, she had to establish that the harassment was so "severe or pervasive" as to alter the terms of her employment, creating a work environment that was both objectively hostile and perceived as hostile by Marrero herself. Faragher, 524 U.S. at 786 (internal quotation marks omitted). As explained below, we conclude that there was sufficient evidence to support the verdict. Before we reach that issue, however, we first must address Goya's argument that Marrero's hostile work environment claim is barred by the statute of limitations.

## A.      Statute of Limitations

Under Title VII, a plaintiff must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e).  In a "deferral jurisdiction" such as Puerto Rico, that period is extended to 300 days.  See id. § 2000e-5(e)(1); Mohasco Corp. v. Silver, 447 U.S. 807, 814 n.16 (1980).[2]  Here, Marrero filed her hostile work environment charge on November 13, 1996.  Counting back 300 days, Goya maintains that she can recover only for events occurring on or after January 18, 1996.

The first time Goya presented that argument in any detail was in its Rule 50 motion for judgment as a matter of law, filed at the close of Marrero's case.  Marrero responded on two fronts.  First, she argued that Goya had forfeited the statute of limitations defense by failing to raise it earlier in the

_____

[2] As we have explained elsewhere:
The full story is more complicated, in part because § 2000e-5(e) interacts with § 2000e-5(c), which imposes a sixty-day waiting period between the filing of a charge with state or local authorities and the filing of a charge with the EEOC[.]  A complainant in a deferral State . . . need only file his charge within 240 days of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved.  If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the 300-day period.
Thomas v. Eastman Kodak Co., 183 F.3d 38, 47 n.5 (1st Cir. 1999) (internal quotation marks and alterations omitted).
Those subtleties are of no import here.  Marrero filed her charge less than one month after one of the instances of harassment that makes up her hostile work environment claim.  As we explain below, that is enough to satisfy the statute of limitations here.

litigation.  Second, she maintained that her hostile work environment claim was governed by the so-called "continuing violation doctrine," and therefore was immune from Title VII's time bar.  Under the continuing violation doctrine, Marrero argued, a plaintiff may recover for events outside the 300-day limitations period "if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims."  O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (internal quotation marks omitted).  Marrero contended that the "chain" of harassment by Cárdenas, which continued into the limitations period, satisfied that standard.

Goya did not dispute that Marrero's allegations of sexual harassment, if true, would satisfy the relatedness requirement of the continuing violation doctrine.  It emphasized, however, that we had refused to apply the continuing violation doctrine in cases where the plaintiff was "aware that [she] was being unlawfully discriminated against while the earlier acts, now untimely, were taking place."  Provencher v. CVS Pharm., 145 F.3d 5, 14 (1st Cir. 1998).  Goya insisted that Marrero was aware of the discrimination at least as early as December of 1995, when -- according to her own testimony -- she suffered a nervous breakdown as a result of Cárdenas's behavior.  Thus, Goya argued that Marrero was obligated to file a charge within the next 300 days and, having failed to do so, could not recover for the earlier (now untimely) events.

-11-

The district court did not address the merits of Marrero's continuing violation claim, or Goya's response. Instead, it held that Goya had forfeited its statute of limitations defense by failing to raise it earlier in the proceedings. We express no view on the forfeiture issue because the Supreme Court's recent decision in National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061 (2002), makes clear that Goya's statute of limitations defense fails on its merits.

In Morgan, the Court distinguished between hostile work environment claims and claims involving discrete acts of discrimination or retaliation, such as a discharge, failure to promote, denial of transfer, or refusal to hire. Id. at 2070-72. As noted, a Title VII plaintiff must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e). The Court reasoned that "[a] discrete retaliatory or discriminatory act 'occurred'" for purposes of the statute of limitations "on the day that it 'happened.'" Morgan, 122 S. Ct. at 2070. Therefore, the plaintiff must file a charge within 300 days "of the date of the act or lose the ability to recover for it." Id. at 2071.

Hostile work environment claims are different. A hostile work environment, the Court explained, is created by "repeated conduct" -- "a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 2073-74 (quoting 42 U.S.C. § 2000e-5(e)(1)). As such, hostile work environment claims do not "turn on single acts but on an aggregation of hostile acts

-12-

extending over a period of time." Havercombe v. Dep't of Educ.,
250 F.3d 1, 6 (1st Cir. 2001). It follows that the "unlawful
employment practice" that triggers the statute of limitations
occurs, not "on any particular day," but "over a series of days or
perhaps years." Morgan, 122 S. Ct. at 2073. Thus, the Court
concluded, the statute of limitations is satisfied as long as the
plaintiff files a charge within 300 days of one of the many acts
that, taken together, created the hostile work environment.

In so holding, the Supreme Court explicitly rejected the
view -- advanced by Goya here -- that "the plaintiff may not base
a suit on individual acts that occurred outside the statute of
limitations unless it would have been unreasonable to expect the
plaintiff to sue before the statute ran on such conduct." Id. at
2075. Title VII, the Court explained, "does not separate
individual acts that are part of the hostile work environment claim
from the whole for purposes of timely filing and liability." Id.
Rather, the "incidents comprising a hostile work environment are
part of one unlawful employment practice" and, in order to comply
with the statute of limitations, "the employee need only file a
charge within [300] days of any act that is part of the hostile
work environment." Id. That standard clearly is satisfied here:
Marrero filed her charge on November 13, 1996, less than one month
after the "Halloween presents" incident.

### B.      Sufficiency of the Evidence

Goya argues that, even if the jury was entitled to
consider Cárdenas's conduct throughout the course of Marrero's

-13-

employment, the evidence was insufficient to establish harassment of the requisite severity or pervasiveness. Although it does not dispute that Marrero subjectively perceived her work environment as hostile and abusive, Goya insists that any harassment by Cárdenas, while perhaps "inappropriate," was too "mild[]" to create an objectively hostile work environment. We disagree.

There is no "mathematically precise test" for determining when conduct in the workplace moves beyond the "merely offensive" and enters the realm of unlawful discrimination. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Rather, the question whether the environment is objectively "hostile or abusive" must be answered by reference to "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. "Subject to some policing at the outer bounds," it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment. Gorski v. N.H. Dep't of Corrections, 290 F.3d 466, 474 (1st Cir. 2002).

Here, the jury reasonably could have found that Marrero was subjected to harassment on a daily basis, including humiliating sexual remarks and innuendos. For example, Cárdenas constantly referred to Marrero as "the redhead" and frequently made comments such as "the redhead is really hot," "the redhead is on fire," or

-14-

"if this is what hell is like then the devil can take me with him." Cárdenas also made repeated comments about Marrero's lips, legs, and clothing. He even used Marrero's hypoglycemia as an avenue for innuendo: making a reference to his diabetes, Cárdenas told her "what goes down in you goes up in me," and asked her "are you sweet to men?" At other times, Cárdenas was more explicit: he once asked Marrero "what are you going to do with the thing you have between your legs?" Finally, the jury could have found that Cárdenas's "Halloween presents" comment was a sexual invitation, coupled with a threat that Marrero would be fired if she did not accept.

Taken together, such comments support the jury's finding of a hostile work environment. See O'Rourke, 235 F.3d at 729 ("Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment."); White, 221 F.3d at 260-61 (finding a hostile work environment where, inter alia, "disgusting comments" and conversations occurred "everyday"). It bears emphasis that the harassment here was more or less constant from Marrero's first day of work in April of 1995 until she left in November of 1996. Thus, this case is easily distinguished from those in which courts have refused to find a hostile work environment based solely on sexual comments that are few and far between. See, e.g., Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 783 (1st Cir. 1990) (expressing doubt as to whether five sexual comments made over the course of a four to five week period constituted harassment severe and pervasive enough to create a hostile work environment). As we have

-15-

observed elsewhere, "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). However, it is one thing to say that employees must learn to tolerate "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." Faragher, 524 U.S. at 778 (internal quotation marks and citation omitted). It is quite another to require employees to suffer the constant attentions of a lascivious supervisor.

Nor did Cárdenas limit himself to a purely private dialogue. He also discussed Marrero's appearance with other employees. For example, he told Marrero's co-workers that she "would be the model that would be used for any future female employees that Goya would hire." Another time, Cárdenas invited a male employee to assess what sort of underwear Marrero was wearing under her skirt. It was hardly unreasonable for Marrero to find such behavior humiliating.

Marrero also testified that Cárdenas subjected her to unwelcome physical touching. On approximately five occasions, Cárdenas made full "body to body" contact with her in the hallway. At other times, he would just "brush[] by" her, or would stand in her way and -- when she tried to pass him -- pretend that they were dancing. When Marrero had to use the photocopier machine, Cárdenas often hovered over her with his hands on her shoulders, or stood close by, rubbing the side of his body against her.

-16-

On other occasions, Cárdenas harassed Marrero in ways that were not explicitly sexual. Using his power as her supervisor, he altered her work hours knowing that it would exacerbate her hypoglycemia. He often stood at her desk and stared angrily at her, and when she did not pay attention to him he would pound her desk with his fist to startle her. He criticized her work unfairly, sometimes embarrassing her by yelling at her in front of her co-workers. Our cases make clear that, "where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim." O'Rourke, 235 F.3d at 729.

Finally, there was evidence from which the jury could have found that Marrero's work was adversely affected by the harassment. She became anxious and depressed, and often found it difficult to concentrate. Marrero's supervisors noticed the change, and -- after the first few months of her employment -- her performance evaluations dropped from "excellent" to "regular."

In sum, there was ample evidence to support the verdict on Marrero's hostile work environment claim. As we noted at the outset, "[o]verriding a jury verdict is warranted only if the evidence is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 208 (1st Cir. 1996) (internal quotation marks omitted). That is not the state of

-17-

the evidence in this case. Accordingly, we affirm the district court's denial of Goya's motion for judgment as a matter of law on the hostile work environment claim.

### III. GOYA'S AFFIRMATIVE DEFENSE

Goya argues, next, that it cannot be held liable for Cárdenas's behavior even if a hostile work environment existed. As a general rule, an employer is vicariously liable for an actionable hostile work environment created by a supervisor. See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. However, the Supreme Court has recognized an affirmative defense to employer liability that "look[s] to the reasonableness of the employer's conduct as well as that of [the] plaintiff victim." Faragher, 524 U.S. at 781; see also Ellerth, 524 U.S. at 765 (describing the affirmative defense). Goya maintains that it established that affirmative defense here, and that the district court erred in denying its motion for judgment as a matter of law on that ground.

The Faragher/Ellerth affirmative defense has two necessary elements, and the employer bears the burden of proof as to both. Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 765. First, the employer must show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Ellerth, 524 U.S. at 765. That requirement typically is addressed by proof that the employer "had promulgated an antiharassment policy with [a] complaint procedure." Id. Second, the employer must establish "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities

-18-

provided by the employer or to avoid harm otherwise." Id. That prong is usually addressed by proof that the plaintiff unreasonably ignored an established complaint procedure.[3]

Thus, the availability of the affirmative defense often will turn on whether the employer had established and disseminated an anti-discrimination policy, complete with a known complaint procedure. Such was the case here. As the district court observed in denying Goya's motion for judgment as a matter of law, "[o]ne of the most hotly contested issues in [the] case, and which depended entirely on the credibility of the witnesses, was precisely whether . . . Goya had in effect a policy against discrimination and whether it installed posters to that end."

---

[3] The defense is not a bar to liability for a "tangible employment action" (such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") that would be actionable under Title VII independent of a hostile work environment. Ellerth, 524 U.S. at 761. Citing that rule, Goya argues that the district court erred in instructing the jury that Marrero had alleged that an "adverse action" had been taken against her. It maintains that, because of that instruction, the jury might have thought that Goya was not entitled to the affirmative defense. That argument need not detain us. Marrero did attempt to prove that Goya took adverse action against her: she hoped to show that Goya (not Cárdenas) retaliated against her and constructively discharged her. But the jury instructions made clear that Goya still could avoid liability for Marrero's hostile work environment claim (which did not involve allegations of a tangible employment action) if it proved the two elements described above. The verdict form shows that the jury rejected the affirmative defense, not because Marrero proved a "tangible employment action," but because, in the words of the verdict form, Goya failed to prove that it had "exercised reasonable care to prevent and promptly correct any sexually harassing behavior" and that "Marrero unreasonably failed to take advantage of any preventative or corrective opportunities provided by Goya."

On the one hand, Marrero and her co-worker Zelma Miranda-Rivera testified that they did not receive any orientation regarding sex discrimination; that they were not given any written policy on sexual harassment or available grievance procedures; that they were not aware of any complaint procedure; and that they never saw any anti-harassment literature posted anywhere in the workplace. Marrero also testified, without contradiction, that Goya ignored her request -- first lodged on October 31, 1996 -- for a copy of the company's anti-discrimination policy.

On the other hand, Nieves testified that Goya had asked an outside law firm to draft a written policy on sexual harassment, and that it received that policy in August or September of 1995. The policy was not dated, however, and on cross-examination Marrero established that Nieves had stated in his deposition that he used the same policy during Marrero's orientation in April of 1995 (several months before he later claimed to have received it). Moreover, although the policy had a signature line so that the employee could certify that she had received it, Goya could not produce a copy signed by Marrero. Nieves testified that Goya never asked its employees to sign the policy.

Nieves also testified that Goya began to use anti-sexual harassment posters in 1991, 1992, or 1993 -- he was not sure when. Nieves stated that the posters were placed all around Goya's facilities, including the glass doors of the entrance to the lobby "so that anyone who would go to Goya would be able to see the poster." However, in the film of Goya's facilities that was shown

-20-

to the jury, there were no posters to be seen anywhere on the premises, including the glass doors of the lobby.

We need not decide which party presented the most persuasive testimony. "[I]t is for jurors, not judges, to weigh the evidence and determine the credibility of witnesses." Ins. Co. of N. Am. v. Musa, 785 F.2d 370, 372 (1st Cir. 1986). Thus, in reviewing the district court's denial of Goya's Rule 50 motion, we "cannot evaluate the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence." Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998) (internal quotation marks omitted). We can grant judgment as a matter of law only if "the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994).

That standard is especially exacting where, as here, the moving party bears the burden of proof on the issue in question. See Serv. Auto Supply Co. v. Harte & Co., Inc., 533 F.2d 23, 24 (1st Cir. 1976). We have said that the party with the burden of proof is entitled to judgment as a matter of law only if it has established its case by "testimony that the jury is not at liberty to disbelieve." Jordan v. United States Lines, Inc., 738 F.2d 48, 49 (1st Cir. 1984) (internal quotation marks omitted). In that situation, relief under Rule 50 is warranted only if the moving party's evidence is "'uncontradicted and unimpeached.'" Serv. Auto

Supply Co., 533 F.2d at 25 (quoting Fed. Ins. Co. v. Summers, 403 F.2d 971, 975-76 (1st Cir. 1968)).

Goya has not satisfied that strict standard here. Although Goya's witnesses testified that the company had an anti-discrimination policy in place during the relevant period and that it disseminated the policy to its employees, that testimony was contradicted by Marrero and her co-worker Miranda-Rivera and called into question by the video tape and Nieves's conflicting statements during his deposition. The jury was "at liberty to disbelieve" Goya's witnesses, Jordan, 738 F.2d at 49, and to credit the testimony by Marrero and Miranda-Rivera.

In order to qualify for judgment as a matter of law on its affirmative defense, Goya had to show that a reasonable jury was compelled to find in its favor on both elements of the defense. We have concluded that Goya has not satisfied that standard with respect to the first prong -- the existence of an antiharassment policy with a known complaint procedure. Accordingly, we need not consider whether the evidence presented at trial compelled a finding in Goya's favor on the second prong.[4] See Faragher, 524 U.S. at 808.

## IV. RETALIATION

Goya argues that there was insufficient evidence to support the jury's finding of retaliation. In order to make out a

---

[4] Nor need we consider Goya's claim that the district court erred in excluding certain evidence that, Goya insists, would have strengthened its case under the second element of the affirmative defense.

-22-

prima facie case of retaliation, Marrero had to prove that (1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity. Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998). Goya does not dispute that Marrero engaged in conduct that is protected by Title VII when she filed her sexual harassment charge. It maintains, however, that Marrero never suffered an "adverse employment action" as a result of that conduct.

We have explained that "[a]dverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" White, 221 F.3d at 262 (quoting Hernandez-Torres, 158 F.3d at 47); accord Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999). Whether an employment action is "adverse" -- and therefore actionable under Title VII -- is gauged by an objective standard. Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996). "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Id.

Here, Marrero's retaliation claim rests on two separate, and allegedly adverse, employment actions: her transfer to the Human Resources Department; and Goya's toleration of harassment by other employees. We address those claims in turn.

-23-

## A.    Disadvantageous Transfer

Marrero filed a charge of employment discrimination with the EEOC on November 13, 1996. She returned to work on Wednesday, November 22, to find that she had been transferred to the Human Resources Department, where she was to serve as Nieves's secretary. Marrero concedes that the transfer was not, on its face, a demotion. She continued to serve as secretary to a Vice President in the company, and her general job description and salary remained the same. Nevertheless, Marrero argues that the transfer was "disadvantageous" because she was required to do more work, subjected to "extreme supervision," and forced to undergo a period of probation.

"The clear trend of authority is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997) (internal quotation marks omitted); accord Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996) ("[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."). Similarly, a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action. See Jones v. Fitzgerald, 285 F.3d 705, 714 (8th Cir. 2002); Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) ("[A] materially adverse change in the

-24-

terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities."). "Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit." Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996).

At the same time, however, "Title VII does not limit adverse job action to strictly monetary considerations." Collins v. Illinois, 830 F.2d 692, 703 (7th Cir. 1987). Congress recognized that job discrimination can take many forms, and does not always manifest itself in easily documentable sanctions such as salary cuts or demotions. Accordingly, Congress "cast the prohibitions of Title VII broadly" to encompass changes in working conditions that are somewhat more subtle, but equally adverse. Rodriguez v. Bd. of Educ., 620 F.2d 362, 364 (2d Cir. 1980). Consistent with that broad statutory mandate, courts have rejected any bright line rule that a transfer cannot qualify as an "adverse employment action" unless it results in a diminution in salary or a loss of benefits.

For example, the Second Circuit held in Rodriguez that the district court erred in dismissing the sex discrimination suit of a junior high school art teacher who was transferred to an elementary school in the same system, notwithstanding the fact that the transfer did not entail a reduction of salary or other monetary benefits. See id. It emphasized that the plaintiff had spent her entire career teaching junior high school students, and in fact had

-25-

recently earned a doctoral degree in art education with a focus on programs for such students. See id. The art programs at the elementary level, the court explained, "were so profoundly different from those in the junior high school as to render utterly useless [the plaintiff's] twenty years of experience and study in developing art programs for middle school children." Id. at 366. Describing the transfer as "a severe professional trauma," the court concluded that such a "radical change in the nature of the work [the plaintiff] was called upon to perform" constituted an adverse employment action. Id.

Similarly, the Seventh Circuit found adverse employment action in Collins, where the plaintiff was transferred from her post as a consultant in the "development group" at the Chicago Public Library to a newly-created job in the library's reference unit. 830 F.2d at 704. The court noted that the plaintiff's new supervisors in the reference unit "seemed unsure of what plaintiff's responsibility and authority would be." Id. Moreover, although the plaintiff previously had her own office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant, she lost those benefits after the transfer. See id. In her new position, the plaintiff was placed at a desk "out in the open," where "a receptionist's desk typically would be located." Id. She "had no telephone at her desk with which she could conduct her business responsibilities." Id. She "was not allowed to have business cards printed and she was no longer listed in professional publications as a library

consultant."  Id.  Finally, rather than doing the consulting work she enjoyed, the plaintiff "was relegated to doing reference work." Id.

In contrast to cases such as Rodriguez and Collins, the evidence presented here showed -- at most -- that the transfer resulted in some minor, likely temporary, changes in Marrero's working conditions.  As we explained above, Marrero was transferred from the Sales and Exports Departments to the Human Resources Department, where she was to serve as Nieves's secretary.  Although Marrero's basic job description and duties remained the same, the jury could have found that she would have been required to do more work after the transfer.  Marrero was the only employee who knew how to prepare certain paper work for the Exports Department. Therefore, as a practical matter, she was forced to do that work even after she was transferred to the Human Resources Department and assumed her new duties there.  Marrero was not compensated for that extra work.

Such a minor increase in work responsibilities is not enough to render a lateral transfer materially adverse.  That is especially true where, as here, there is no indication that the increase would have been permanent.  Just as Marrero had to go through a training period in her new position, the employee who replaced her in the Sales and Exports Departments would need to be trained before she could take over all of Marrero's duties. However, Marrero testified that she could not remember whether she had trained the employee who assumed her old post.  She conceded,

-27-

moreover, that she never complained to Nieves or anyone else at Goya regarding her continuing work in the Exports Department. Most importantly, Marrero left work after spending no more than three days in her new position. Given that short time span, she could not show that the increase in work was anything other than an unintended and temporary inconvenience caused by the transition.

Marrero also presented evidence regarding the less tangible aspects of the transfer. She testified that, during the three days she spent in the Human Resources Department, Maritza Ramos "precluded [her] from performing some of the basic duties of her position." Ramos told Marrero not to open Nieves's mail but to pass it along to her, and not to handle any confidential phone calls. Moreover, Nieves and Ramos subjected her to "extreme supervision" -- watching her while she did her filing, and standing behind her when she talked on the phone. Marrero felt that Nieves and Ramos were "exerting pressure on [her]."

Finally, Marrero was forced to undergo a probationary period in her new post, which she perceived as a loss of job security. She did not feel that she was a real part of the department; she believed her supervisors "hadn't taken [her] into account." A departmental meeting was held while Marrero was there, but she was not invited. She believed that the other members of the department "had snubbed" her.

That evidence -- even when examined in the light most favorable to Marrero -- "is insufficient to prove that, viewed objectively, this transfer was an adverse personnel action." Serna

v. <u>City of San Antonio</u>, 244 F.3d 479, 484 (5th Cir. 2001) (emphasis added).  It is not enough that Marrero felt stigmatized and punished by the transfer.  A more "tangible change in duties or working conditions" is needed before we can conclude that the transfer was, in substance, a demotion.  <u>Phillips</u> v. <u>Collings</u>, 256 F.3d 843, 848 (8th Cir. 2001).  As the Eighth Circuit recently explained, the sort of "intensified personal animus, hostility, disrespect, and ostracism" that Marrero alleged here "fails to constitute a material employment disadvantage" sufficient to transform an ostensibly lateral transfer into an adverse employment action.  <u>Jones</u>, 285 F.3d at 714; <u>see</u> <u>also</u> <u>Manning</u> v. <u>Metropolitan Life Ins. Co.</u>, 127 F.3d 686, 693 (8th Cir. 1997) (holding that evidence of "disrespect and ostracization by . . . supervisors" did not establish an adverse employment action).  Rather, in order to prove that the transfer was materially adverse, Marrero had to show that Goya "[took] something of consequence from [her], say, by . . . reducing her salary, or divesting her of significant responsibilities," or that it "withh[e]ld from [her] an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service."  <u>Blackie</u>, 75 F.3d at 725.  Such proof is wholly lacking here.[5]

---

[5] We note that, on different facts, the imposition of a probationary period could tip the scales in the employee's favor. Job security is "something of consequence," <u>Blackie</u>, 75 F.3d at 725, the deprivation of which could constitute an adverse employment action. Here, however, there was no evidence from which the jury could have gauged the effect, if any, Marrero's probationary status had on her job security. For example, Marrero

### B. Toleration of Harassment

Marrero also alleges that Goya retaliated against her by tolerating harassment by its employees. As we explained in the previous section, "environmental" harm such as harassment by co-workers or supervisors is actionable under Title VII if it is so severe or pervasive that it alters the conditions of the plaintiff's employment. Just as an employer will be liable for discrimination if it tolerates a racially or sexually hostile work environment, it will be liable for retaliation if it tolerates severe or pervasive harassment motivated by the plaintiff's protected conduct. See White, 221 F.3d at 262; Richardson v. N.Y. State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir. 1999).

Here, however, any suggestion that Marrero was subjected to a retaliatory hostile work environment is belied by the undisputed fact that she spent less than three days at Goya after filing her complaint with the EEOC. See Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001) (rejecting as a matter of law a hostile work environment claim based on harassment occurring during a four-day period on the ground, inter alia, that the "greatly abbreviated" time period "substantially undermined

---

did not present any evidence that her one and a half years at Goya gave her a particular kind or degree of security that dissolved once she was placed on probation. Absent such evidence, the jury could not reasonably have concluded that Goya took something of consequence from Marrero, or withheld an accouterment of the employment relationship from her, by forcing her to go through a probationary period in her new position.

[plaintiff's] contention that the [harassing] conduct was either sufficiently frequent or severe" (footnote omitted)). Her retaliation claim is, by definition, based on the events that occurred within that three-day period. Obviously, no one at Goya could have harassed Marrero in retaliation for her protected conduct until <u>after</u> she engaged in that conduct.

That said, the preceding year and a half of sexual harassment undoubtedly colored Marrero's perception of the events in her last three days at Goya, as it would for any reasonable employee in her position. Thus, we do not view those three days in a vacuum, but consider them in light of all that came before. To that limited extent, Marrero's experiences before engaging in the protected conduct are relevant to her retaliation claim.

Even when examined in that light, however, the evidence of retaliatory harassment falls far short of the mark. Marrero testified that, during the time she spent in the Human Resources Department, Nieves and Ramos "pressured" and "snubbed" her. Moreover, Cárdenas continued to bother her in her new position. The jury reasonably could have found that some of that harassment was motivated by Marrero's protected conduct. Cárdenas once said to Marrero: "you thought that you were going to get me into hot waters but you ended up being in hot waters." He also laughed at her in a taunting fashion, indicating, "I got away with it."

A few incidents over the course of three days cannot reasonably be deemed "pervasive" retaliatory harassment, particularly when those incidents are of the same type and kind

-31-

that repeatedly occurred in the workplace before the plaintiff engaged in the protected activity. Thus, it was incumbent on Marrero to show that the retaliatory harassment was so severe that it rendered her work environment objectively hostile and abusive notwithstanding the extremely short time span. See Faragher, 524 U.S. at 788 (explaining that "isolated incidents" are not sufficient to create actionable harassment "unless [they are] extremely serious"). The conduct by Nieves and Ramos, while certainly unpleasant, was not particularly severe. As such, it does not support the imposition of liability under Title VII.

Cárdenas's comments present a slightly closer question. Given that Marrero had endured a year and a half of harassment while under his supervision, it would not be unreasonable for her to find his taunting especially offensive. Moreover, Marrero presented evidence from which the jury could have found that Nieves was aware of Cárdenas's behavior. That fact surely contributed to her feeling that the environment in the Human Resources Department was hostile. But the question remains whether these acts were severe enough, "without the added weight of repetition over time or cumulation with other acts of [retaliatory] harassment, to stand alone as the basis for a harassment claim." Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) (finding sufficient severity based on two incidents of forcible sexual contact with "overtones of . . . attempted sexual assault"). We conclude that they were not. Title VII does not "guarantee[] a working environment free from stress." Calhoun, 798 F.2d at 561 (internal

-32-

quotation marks omitted). Something more "egregious" than rudeness and mockery is needed before we can permit a finding of a retaliatory hostile work environment based on intermittent contact over a three-day period.

In sum, we conclude that the district court erred in denying Goya's motion for judgment as a matter of law on Marrero's claim of retaliation. Even when viewed in the light most favorable to the verdict, the evidence presented at trial was insufficient to establish that Marrero was subjected to an adverse employment action as a result of her protected conduct.

## V. CONSTRUCTIVE DISCHARGE

Marrero left Goya on November 22, 1996, and -- after several months of sick leave -- formally resigned in March of 1997. She claims that she was forced to leave in order to escape the intolerable working conditions at Goya. Thus, she sought "post quit" damages in the form of back pay, on the ground that she was constructively discharged. Barbara Lindeman & Paul Grossman, Employment Discrimination Law ch. 21, at 838 (3d ed. 1996); see Hernandez-Torres, 158 F.3d at 47 (explaining that a "discharge" under Title VII "may be constructive as well as a direct firing"). Although the verdict form did not require the jury to state explicitly its conclusion on Marrero's claim of constructive discharge (as it did with respect to her hostile work environment and retaliation claims), the jury apparently credited her version of events, as it awarded her $11,250 in back pay.

Goya argues that Marrero's claim of constructive discharge must stand or fall with her retaliation claim. It maintains that if we find (as we have) that the evidence was insufficient to support the jury's verdict on the issue of retaliation, we must vacate the award of back pay as well. However, the evidence presented at trial,[6] the arguments by counsel,[7] and the district court's jury instructions[8] all show that Marrero claimed that two separate stressors forced her to retire: severe and pervasive harassment by Cárdenas, and the retaliation by Goya. Although we have concluded that Marrero failed to establish that the events that occurred during the alleged period of retaliation rose to the level of an adverse employment action, the evidence drawn from that period remains relevant to her claim of constructive discharge. Just as an act of harassment that is not actionable in and of itself may form part of a hostile work environment claim, see Morgan, 122 S. Ct. at 2073, Marrero's experiences during her last week of work -- although insufficient to establish liability on their own -- are properly part of her

---

[6] For example, Marrero testified that she was forced to resign "because of the retaliation and the hostile work environment."

[7] Marrero's counsel stated in his closing argument that Marrero "was forced to resign her employment because the sexual harassment created intolerable working conditions" and that "she was constructively discharged because she complained of the sexual harassment to the Equal Employment Opportunity Commission."

[8] The judge told the jurors that Marrero claimed "that she was forced to resign because of defendant's discriminatory and retaliatory conduct" and instructed them that they could award back pay if they found that "she was exposed to sexual harassment and/or retaliation."

constructive discharge claim.  Therefore, we must examine that claim in light of all the evidence presented at trial.

In order to establish that Goya should be held responsible for the economic losses she suffered as a result of quitting, Marrero had to show that her working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977).  The standard is an objective one; it "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held."  Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000); see also Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." (internal quotation marks omitted)).

We conclude that the jury reasonably could have found that Marrero's working conditions were objectively intolerable, compelling her resignation.  Marrero was subjected to constant harassment by Cárdenas during the year and a half she spent at Goya.  To be sure, the fact that the plaintiff endured a hostile work environment -- without more -- will not always support a finding of constructive discharge.  See Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").  Rather, the jury must find that

the working conditions were so unpleasant that "staying on the job while seeking redress [would have been] intolerable." Keeler v. Putnam Fid. Trust Co., 238 F.3d 5, 10 (1st Cir. 2001). In addressing that question, however, the jury reasonably can take into account how the employer responded to the plaintiff's complaints, if any. An employee's assessment of whether she can remain at work while pursuing remedies for the harassment she has endured obviously will be affected by the likelihood that the harassment will continue unabated.

Here, Marrero repeatedly complained about the harassment to her supervisors Rivera and Diaz, and to Nieves in the Human Resources Department. Nothing was done until she filed a charge of sexual harassment with the EEOC. Even then, Goya took no action against Cárdenas. Instead, it transferred Marrero to a new post as Nieves's secretary.

Although Marrero was no longer under Cárdenas's supervision, she was still stationed near his office. Goya knew that Cárdenas would continue to interact with Marrero in her new position because Cárdenas's duties required him to go to her work area, and Marrero's desk was near the office of Cárdenas's supervisor. Yet Goya refused Marrero's request that she be moved to another building, away from Cárdenas. Not surprisingly, therefore, Cárdenas continued to harass her even after the transfer.

Based on that evidence, the jury reasonably could have found that "a reasonable person in [Marrero's] shoes would have

felt compelled to resign."  Alicea-Rosado, 562 F.2d at 119.  Given the inadequacy of the transfer after a long history of hostility and frequent complaints, Marrero reasonably believed that her working conditions at Goya would not change and that she could only anticipate more of the same intolerable harassment.  If she wanted to avoid further harm, she would have to leave work entirely.  See Cortes v. Maxus Exploration Co., 977 F.2d 195, 200-01 (5th Cir. 1992) (affirming finding of constructive discharge where employer refused to take adequate corrective measures to protect employee from future harassment).

Indeed, the jury could have found that the transfer actually made things worse for Marrero.  Not only did Cárdenas continue to harass her sexually, but he also taunted her for her (apparently unsuccessful) attempts to remedy the situation by complaining to Goya officials.  Nieves -- the official to whom Marrero had brought her complaint -- was aware of Cárdenas's behavior, but did nothing to stop it.  Adding insult to injury, Nieves made Marrero feel as if she were the problem employee.  He "pressured" her and subjected her to "extreme supervision," including listening to her phone calls.

As we explained in the previous section, absent some more substantial and tangible changes in Marrero's duties or work conditions, such personal unpleasantness is insufficient to establish that the transfer was a materially adverse act of retaliation.  And, given the fact that Marrero remained in her new position for less than three days, the harassment by Cárdenas and

the pressure from Nieves and Ramos were neither severe nor pervasive enough to establish a retaliatory hostile work environment.  However, when combined with the harassment Marrero endured during the previous year and a half, the events during those final days provide further support for the jury's finding of constructive discharge.

Unlike Marrero's retaliation claim -- which by definition is confined to the three-day period she spent at work after filing her charge of sexual harassment -- her claim of constructive discharge is based on the totality of her experience at Goya.  Accordingly, in assessing that claim, the jurors were entitled to draw on all the evidence of harassment, and Goya's response.  In order to override the verdict, we must conclude that all of that evidence, together with all reasonable inferences in favor of the verdict, is insufficient to support the jury's finding that a reasonable employee in Marrero's position would have felt compelled to quit.  We see no basis for such a conclusion here.  The jury reasonably could have found that Marrero's working conditions, hostile and abusive before the transfer, became even worse after the transfer, and that a reasonable employee would have believed that she had no choice but to resign.

## VI.  PUNITIVE DAMAGES

Goya argues, finally, that Marrero was not entitled to punitive damages.  It points out that, in cases involving misconduct by a supervisor, the employer will not be liable for punitive damages if it made a "good-faith effort to comply with the

-38-

requirements of Title VII." Romano v. U-Haul, Int'l, 233 F.3d 655, 669 (1st Cir. 2000). Based on the evidence presented at trial, however, the jury reasonably could have found that Goya made no such effort, but rather acted with "reckless disregard" for Marrero's rights. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999). Marrero complained about Cárdenas's behavior to her supervisors in the Exports Department -- first Rivera, and then Diaz. Neither did anything. Indeed, on one occasion Rivera cautioned Marrero that she should keep in mind that Cárdenas was a vice president and had worked at Goya for many years, whereas she was a relative newcomer. Marrero also complained to Nieves, who simply advised her to "ignore" Cárdenas. It was not until Marrero filed a sexual harassment charge with the EEOC that Goya took action.

Moreover, as we explained with respect to Goya's affirmative defense, the jury was justified in finding that Goya did not have a sexual harassment policy in effect during the relevant events. Even if such a policy existed, Goya did not present any evidence that it had implemented it, either through educating its employees or enforcing its mandate. See Romano, 233 F.3d at 670 (holding that the defendant employer is responsible for proving that it made good faith efforts to comply with the requirements of Title VII, and that the mere existence of an antidiscrimination policy was insufficient absent proof that the employer actually implemented the policy). Thus, we see no merit

-39-

to Goya's claim that the punitive damages award should be set aside.

## VII.    CONCLUSION

We affirm the judgment of the district court with respect to Marrero's hostile work environment and constructive discharge claims, her entitlement to punitive damages, and Goya's attempt to establish the Faragher/Ellerth affirmative defense. We reverse the district court's judgment with respect to Marrero's claim of retaliation, concluding that Goya was entitled to judgment as a matter of law on that claim.

That leaves the matter of damages. As noted, the jury awarded Marrero $175,000 in compensatory damages, $11,250 in back pay, and $75,000 in punitive damages. We have no way of knowing what portion, if any, of the compensatory and punitive damages awards was based on the jury's erroneous finding of retaliation. Accordingly, we have no choice but to remand for a new trial as to damages for the hostile work environment and the constructive discharge.

Finally, based on its finding that Marrero was the "prevailing party" in this action, the district court awarded her attorney's fees and the costs of litigation. See 42 U.S.C. § 2000e-5(k). On remand, the court should consider whether an adjustment in that award is appropriate in light of our holding with respect to Marrero's claim of retaliation. See Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1191 (1st Cir. 1996)

-40-

(explaining that "a court should award only that amount of fees that is reasonable in relation to the results obtained").

**<u>Affirmed in part, reversed in part, and remanded</u>**.   No costs are awarded.