**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 02-1746

DAWN CAPUTO,

Plaintiff, Appellant,

v.

CITY OF HAVERHILL, FRITZ ESCH and JOHN BARRUTO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lynch, Circuit Judge.

Thomas J. Gleason on brief for appellant.
Maureen L. Reilly on brief for appellees.

June 13, 2003

**BOWNES**, <u>**Senior Circuit Judge**</u>.   Plaintiff-appellant, Dawn Caputo ("Caputo"), brought a six count complaint in the district court against her employers, The City of Haverhill; Fritz Esch, School Superintendent of Haverhill; and John Burruto ("Burruto"), Principal of Haverhill High School.  At the heart of this case is Caputo's allegation that the defendants discriminated against her based on her gender.  The district court found that no reasonable jury could reach such a conclusion and granted the defendant's motion for summary judgment.  We affirm.

## I.   BACKGROUND

Taken in the light most favorable to Caputo, <u>MacGlashing</u> v. <u>Dunlop Equip. Corp.</u>, 89 F.3d 932, 936 (1st Cir. 1996), the facts are as follows.  In 1994, Caputo was hired as head coach of Haverhill High School's boys and girls track team.  She maintained this position until it was eliminated in September 1998.  Caputo experienced great success as head coach.  Under her tutelage, the boys indoor track team won the State Championship for the first time in Haverhill High School's history.

In July 1996, Martha Jamieson ("Jamieson") became Haverhill's new athletic director.  Under Jamieson's direction, assistant coaches were added to the track program.  According to Caputo, she was "extremely elated" by this addition because the track "program was dramatically understaffed."

Beginning in the spring of 1997, Caputo began to have problems

with her supervisors. Caputo was reprimanded for allowing a student-athlete to practice without having completed the required physical consent forms. In June, Jamieson spoke to Caputo about a phone call Caputo placed to the home of the Brockton track coach, whose team had recently defeated Haverhill in a track meet. According to Caputo, she told the coach's son that, "if your dad has any class, he'll give the trophy back." In September, Principal Burruto disciplined Caputo for writing a critical memorandum about the cross country coach, Mike McGuire ("McGuire"). Despite Burruto's warning, Caputo's comments continued. She repeatedly made "evaluative statements" about McGuire to the cross country athletes, including telling them that she should have been their coach and that they would have achieved more success under her leadership. Caputo also spoke to students and a newspaper reporter about McGuire not being hired for the position of assistant indoor track coach.

Burruto met with Caputo in response to these incidents, but no disciplinary action was taken. In a memorandum dated December 12, 1997, Burruto informed Caputo that her behavior was intolerable and if it persisted, she would be subjected to "disciplinary action which could include suspension, or even dismissal from her employment."

Caputo continued to make comments into 1998. In May, Caputo told some of her physical education students that she would no

longer be coaching the outdoor track team. When asked by her students if McGuire would be replacing her, Caputo told them that he would not because he was "not half the coach that [she] was." In response to this incident, Burruto held a meeting with three students and questioned them about Caputo's comments. All three students concurred that Caputo was speaking negatively about McGuire. Burruto then met with Caputo to discuss the matter, but took no disciplinary action.

On September 16, 1998, Caputo met with both Jamieson and Burruto for a performance review. Two written evaluations, dated November 12, 1997, and March 12, 1998, found "unsatisfactory" job ratings. Areas of improvement included "professionalism with colleagues," and "professionalism with her relationships with student-athletes." These same evaluations, however, commended Caputo for her work ethic and the time she invested in the track program. Approximately ten percent of the other coaches also received "unsatisfactory" evaluations.

At this same meeting, Jamieson told Caputo about a plan to restructure the track program which would eliminate the position of head track coach. The new track program would resemble approximately sixty to seventy percent of the other schools in the Merrimack Valley Conference, of which Haverhill High School was a member. Jamieson explained that the program would be divided into four parts, with one coach overseeing each of the following

-4-

programs: boys indoor track; girls indoor track; boys outdoor track; and girls outdoor track. The impetus for the change was that Haverhill had one of the largest track programs in the conference, but one of the smallest coaching staffs.

Although Caputo was "shocked" and "devastated" by the news, Jamieson encouraged her to reapply for one of the new coaching appointments. Shortly thereafter, Caputo was named head coach of the boys indoor track team. Before hiring her, the School Superintendent of Haverhill had Caputo sign and agree to a list of contingencies. These included agreeing to work professionally with other coaches and students, and refraining from criticizing fellow staff members in front of students. After signing the new contract, Caputo was not subjected to any further discipline. At the completion of the winter season, Caputo was hired as head coach of the boys outdoor track team. This placed Caputo in charge of two of the four track teams. As head coach of two teams, Caputo made more money than she had when she was the head coach of the entire track team. Caputo previously made $4,230 a season. Now, Caputo earned $5,200 a season.

During the 1999 season, Caputo became outraged by Jamieson's and Burruto's handling of a disciplinary matter involving her "best athlete." Three eyewitnesses said they saw the athlete violently push another student. Caputo, however, and five other eyewitnesses who observed the event from a different vantage point, claimed that

there was no pushing.  Jamieson and Burruto did not believe Caputo's version of events and subsequently suspended the athlete. As a result, the athlete could not compete in track meets over a ten day holiday period.  According to Caputo, this incident was the "straw that broke the camel's back," and during a meeting with Jamieson on April 26, 1999, Caputo announced her resignation. After Caputo resigned, Jamieson asked her to reconsider, but she declined.  Haverhill twice posted advertisements to fill Caputo's positions, although there is no evidence that the positions were actually filled.

Following her resignation, Caputo filed suit in the district court.  Caputo alleged that the defendants violated her constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment; discriminated against her based on her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e); and violated various state laws. The defendants moved for summary judgment.  The district court granted the defendants' motion for summary judgment on the federal claims and declined to exercise jurisdiction over the pendent state law claims.  On appeal, Caputo challenges the district court's ruling on the federal gender discrimination claim, but not the due process or equal protection claims.  Caputo also challenges the district court's failure to consider her state law claims.

## II.  DISCUSSION

We review a district court's entry of summary judgment <u>de novo</u>.  <u>Segrets, Inc.</u> v. <u>Gillman Knitwear Co., Inc.</u>, 207 F.3d 56, 61 (1st Cir. 2000).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The primary issue in this case is whether Caputo lost her job because of gender discrimination.  In discrimination discharge cases, we apply the <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973), burden shifting analysis.  The first step in the analysis requires a plaintiff to establish a prima facie case.  This is accomplished when a plaintiff shows that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate employment expectations; (3) she was actually or constructively discharged; and (4) she was replaced by another individual of similar skills or qualifications, thereby confirming the employer's continued need for equivalent services.  See <u>Vega</u> v. <u>Kodak Caribbean</u>, 3 F.3d 476, 479 (1st Cir. 1993).  The third prong is the portion of the prima facie case that is disputed by the parties and our discussion is focused accordingly.

A constructive discharge is a "label for treatment so hostile or degrading that no reasonable employee would tolerate continuing

in the position." Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001). The standard is an objective one: "it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002). When this standard is properly applied, it "does not guarantee a workplace free from the usual ebb and flow of power relationships and inter-office politics." Suarez v. Pueblo Intern, Inc., 229 F.3d 49, 54 (1st Cir. 2000). An injury to Caputo's "ego or prestige does not furnish a legally cognizable reason to treat a resignation as a constructive discharge." Id. at 55.

In the instant case, Caputo claims that she was forced to resign from her position due to hostile and degrading treatment. Caputo maintains that three pieces of evidence support her claim. First, Caputo says that she was treated in a hostile and degrading manner when Jamieson and Burruto restructured the track program. A constructive discharge can arise from, among other things, "reassignment with significantly diminished job responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). However, "a reduction in responsibility or a change in the way business is done, unaccompanied by a diminution in salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge." Suarez 229 F.3d at 55.

-8-

There is no evidence that the restructured track program significantly diminished Caputo's job responsibilities or the quality of her working conditions. While the new program decreased the number of students for which Caputo was responsible, her new position left her in charge of two high school track teams: the boys indoor and outdoor teams. This is not a case where Caputo was demoted from a supervisory position to one with little or no managerial responsibilities whatsoever. Cf. Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001) (employee was "taken from a position of substantial responsibility supervising a number of employees," and transferred to a job involving only "sketchy menial" tasks); Jirau-Bernal v. Agrait, 37 F.3d 1, 4-5 (1st Cir. 1994) (employee "was transferred from a position with supervisory responsibility for more than 200 employees, to a nonsupervisory position . . . ."). Coaching these two particular track teams may have been less prestigious than coaching just one team, but a loss of prestige is not sufficient, standing alone, to support a finding of constructive discharge. See Serrano-Cruz v. DFI P.R., Inc., 109 F.3d 23, 27 (1st Cir. 1997).

Nor did Caputo suffer a reduction in salary. Id. at 26 ("Salary considerations are important in determining whether a job transfer can support a claim of constructive dismissal."). In fact, Caputo was making more money after the restructuring than she

-9-

had been previously making. In short, the record before us reveals that Caputo "still retained duties and emoluments appropriate to [her] rank." Suarez, F.3d at 55. Therefore, we find that the restructuring of the track program is not sufficient evidence of hostile or degrading treatment by the defendants to be a constructive discharge.

Caputo also claims that she was treated in a hostile and degrading manner by being subjected to written reprimands, unsatisfactory performance evaluations, and being asked to sign a list of contingencies before she was able to accept her new coaching position. Caputo, however, admits to partaking in the underlying behavior for which she was disciplined. Under such circumstances, we cannot say that Caputo was subjected to objectively hostile or degrading treatment. Being disciplined is certainly unpleasant, but if Caputo wanted the reprimands to cease, she simply could have complied with her employers' professional standards.

Finally, Caputo cites the suspension of her best athlete as evidence of the defendants' hostile treatment towards her. There is simply no evidence in the record that this event adversely affected Caputo's job responsibilities or working conditions. We do not think that an objectively reasonable coach would construe the suspension of an athlete who violently pushed a fellow student as creating hostile working conditions so severe that she would

feel compelled to resign.

We also note that Caputo was asked to reconsider her resignation, but refused to do so. She resigned voluntarily.

In sum, we rule that Caputo failed to present a prima facie case of gender discrimination because the restructured track program, the written reprimands and unsatisfactory performance evaluations, and the suspension of a talented athlete do not constitute a constructive discharge. We need not address the remaining steps in the McDonnell Douglas burden shifting analysis.[1] Summary judgment for the defendants was correctly granted.

We now briefly turn to whether the district court erred in not deciding Caputo's pendent state law claims. Caputo addresses this matter in the statement of issues section of her appellate brief, but completely fails to subsequently argue it. The issue is therefore waived. See Brown v. Tr. of Brown Univ., 891 F.2d 337, 352 (1st Cir. 1989) (issues not argued in brief are abandoned); see also Fed. R. App. P. 28(a) (brief must contain statement of issues

---

[1] While our above ruling ends the matter, we note further that even supposing error in granting summary judgement for failure to present a prima facie case of discrimination, the defendants would still prevail under the McDonnell Douglas framework. The defendants' decision to increase coaching supervision in the track program conformed with the prevailing practice at similar schools in the area. Thus, the defendants presented a legitimate nondiscriminatory reason for their changes in the structure of the coaching staff. Straughn v. Delta Airlines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001). Caputo has presented no evidence even suggesting, let alone demonstrating, that the defendants' reason for changing her responsibilities was pretextual.

-11-

presented for review <u>and</u> argument with respect to such issues).

## III. CONCLUSION

After viewing the record in the light most favorable to Caputo, we rule that she has not presented a prima facie case of gender discrimination. Caputo also waived her argument regarding the state law claims. The district court's grant of summary judgment for the defendants is **AFFIRMED.**