Shellee DYKSTRA, Plaintiff,

v.

FIRST STUDENT, INC., Defendant.

No. CIV.03–118–B–K.

United States District Court,
D. Maine.

April 30, 2004.

Kevin M. Cuddy, Cuddy & Lanham, Bangor, ME, for Shellee Dykstra, Plaintiff.

James R. Erwin, Pierce Atwood, Joanne H. Pearson, Pierce, Atwood, Portland, ME, for First Student Inc, Defendant.

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT [1]

KRAVCHUK, United States Magistrate Judge.

The plaintiff, Shellee Dykstra, contends that the defendant, First Student, Inc., discriminated against her on the basis of sex in connection with various changes and other events in the workplace. First Student has moved for summary judgment. I grant the motion with respect to all claims save Dykstra's Title VII equal pay claim

### Facts [2]

In 1986, Champion of Maine hired Shellee Dykstra to fill a bus driver position.

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2. The factual statement recited herein is drawn from the parties' Local Rule 56 statements of material facts in accordance with the Local Rule. Factual statements, qualifications and denials not supported by record citation have been disregarded. D. Me. Loc. R. 56(e). This factual statement construes the available evidence in the light most favorable to the non-movant, Dykstra, and draws those reasonable inferences that are in her favor. *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 276 (1st Cir.2003).

Champion was a small, family owned school bus company that operated bus lots in Alton, Glenburn, Greenbush and Hampden, Maine. Dykstra was based out of the Glenburn lot. Unlike Alton and Hampden, the Glenburn lot does not have an office building and is little more than a parking lot for buses. In addition to her bus driving duties, Dykstra served as a liaison between the Glenburn lot and Alton, the location from which Champion performed most administrative functions. Dykstra would monitor whether her fellow bus drivers arrived to work and departed from the lot on time and would relay information to Alton if a bus driver or bus was behind schedule. Dykstra also addressed disciplinary issues that arose with schoolchildren who rode on her and other drivers' buses, scheduled bus maintenance and ordered fuel for the Glenburn lot. According to Dykstra, she held the title of supervisor while she was employed by Champion. However, Dykstra acknowledged during her deposition that Champion did not assign titles to its employees. Dykstra also testified that employees would do any job that needed to be done, if they knew how to.

Between 1986 and 2001, Dykstra held different positions with Champion and worked for the Company on both a full and part-time basis. In these various positions, Dykstra performed limited bus maintenance (fueling buses, cleaning and repairing seats and checking oil), filled in as dispatcher when needed, and performed some additional office work. Although Dykstra considered her bus to be her office, she also performed some limited office work in Alton, such as preparing schedules of routes for the buses to reflect changes in the school-based population during the summer. Bus driving, however, was Dykstra's primary job responsibility. While employed by Champion, Dykstra received compensation on a salary basis. Dykstra reported to Laura Sanborn, one of Champion's owners, who also served as the dispatcher at the Alton lot. Another principal at Champion, Harry Sanborn, acted as supervisor of the Alton lot.

In December 2000, Champion hired Michael Julian as the supervisor of its Hampden lot. Julian was responsible for opening the Hampden location, making sure that all the bus drivers showed up on time and that the buses were ready, addressing discipline problems with children on the Hampden buses, and dispatching. Unlike Dykstra's location in Glenburn, the Hampden lot had an office and was staffed by an administrative assistant, Kim Mayo, who assisted Julian in his duties, performed some dispatching and managed payroll accounts. Unlike Dykstra, Julian did not drive a bus or perform yard work, such as checking fluids or fueling buses. Thus, although Julian and Dykstra performed some similar duties, Julian's was an office job with primary emphasis on administrative duties such as dispatching and finding replacement drivers when necessary, whereas Dykstra was primarily a bus driver. Prior to working for Champion, Julian had gathered some ten years of supervisory experience working for other school bus companies in Northern New England.

In July 2000, Champion hired Steve Hatch to serve as its safety officer and bus driver trainer. On occasion, Hatch also served as a fill-in bus driver. Hatch's affiliation with Champion went back to 1994, when he started working as a part-time trip driver during his days off from his primary employer, the Alton[3] Police

---

While we are on the topic of rules, counsel should note that Local Rule 7(e) indicates, among other things, "All memoranda shall be ... double spaced."

3. The suggestion that Alton had a police de-

Department. As of 2000, Hatch had worked for the department for 26 years. Hatch began his employment for the police department as a patrolman, was promoted to detective, and then to patrol sergeant. As a patrol sergeant for approximately twenty years, Hatch supervised dispatch and worked doing dispatch as well.

In March 2001, First Student acquired Champion. After the acquisition, the school bus operations formerly owned by Champion were folded into First Student's organization. Edward Leclerc, First Student's Vice President for Region 11, which includes Maine, came to have oversight of the former Champion of Maine bus operations. In 2001, First Student hired Jason Feugill to serve as manager of the former Champion locations. First Student maintained Dykstra as an employee working out of the Glenburn lot. However, First Student made some changes in operations that impacted Dykstra's understanding of what her job was and what responsibilities she owed to the company. Most significantly, by November 2001 Dykstra came to understand that First Student had given her the job title of "Lead Driver" for the Glenburn lot, not "Supervisor." Lead driver is a term of art used in the school bus industry to reflect a non-supervisory position in which the driver is responsible for additional administrative tasks above and beyond driving a bus. According to

First Student, "Dykstra continued in the same position after the sale, with the same responsibilities and rate of pay." According to Dykstra, "Her job changed in November of 2001. Her pay changed from salary to hourly. Mrs. Dykstra was admonished for not doing her job and then for doing it and asking for overtime pay." Both of these statements mischaracterize Dykstra's deposition testimony in certain regards. The cited portions of the transcript reflect that First Student designated Dykstra's position as that of lead driver and changed her position to an hourly wage position rather than a salaried one. The transcript also reflects that Dykstra continued to receive the same pay, despite the changed designation, and was asked to perform the same limited supervisory duties after a period in which she believed First Student did not want her to perform them. The particulars of this temporary change in Dykstra's duties are discussed in further detail below.[4]

First Student also maintained Hatch as an employee. Essentially, Hatch's duties remained the same as they had been under Champion's ownership, involving some safety issues, driver training and dispatching. First Student also maintained Julian as an employee at the Hampden office, although the various sources cited by the parties reflect that he assumed additional

---

partment is taken from the defendant's statement of material facts, ¶ 25, and is not contested by plaintiff's counsel. In fact, Alton does not have a police department. It is presently served by officers employed within the Penobscot County Sheriff's Department and the Maine State Police Department. Because Dykstra does not contest Hatch's employment history in law enforcement, I assume for purposes of this motion that Hatch was employed as a police officer. I might also take judicial notice of *State v. Madden*, 357 A.2d 516, 517 (Me.1976), which refers to "one Stephen Hatch of the Old Town Police."

4. According to Dykstra's testimony, she was told she was "no more than a bus driver," but was still being asked to take care of the additional duties she had performed for Champion. After being told that she was a bus driver and not a supervisor and that her compensation would be based on an hourly rate rather than a salary, Dykstra stopped performing additional duties for a time until she was asked to resume them, whereupon she received overtime pay, but was told by her supervisor, Mike Julian, that she was not supposed to receive overtime in her position. (Dykstra Depo. Trans. at 49–53.)

responsibilities in or around the summer of 2001.

During the summer of 2001, First Student implemented certain changes in "pay structure." Most significantly for Dykstra, First Student designated all bus driver positions as hourly positions. Initially, Dykstra was paid $9.75 per hour for time she spent driving a bus. In August 2001 her hourly rate increased to $10 per hour. Dykstra took offense at being designated lead driver rather than supervisor for the Glenburn lot and at the change from salary to hourly compensation. At some point during the fall of 2001 Dykstra requested a meeting and a meeting occurred with Jason Feugill. During this meeting, Feugill told Dykstra to decrease her responsibilities in order to reduce or eliminate the overtime hours she was working. Dykstra testified that Feugill also told her at this meeting that she was nothing more than a "stupid bus driver" and asked her "what all women were about—didn't she get it." Dykstra decreased her hours as requested by Feugill, but at some point Julian asked Dykstra to start working overtime again in order to ensure that all necessary work was getting done. She did so, but Feugill continued to be displeased at the number of overtime hours Dykstra was working.

Roughly contemporaneous with these developments, in the summer of 2001 Harry Sanborn left his supervisory position at the Alton office. Rather than refilling the position, First Student restructured operations at the Alton and Hampden locations by combining the supervisory duties at both locations into one position. First Student gave Julian this position and in-creased his pay from $480 to $600 per week.

In August of 2001,[5] First Student hired Troy Smith as a new bus driver and also assigned to Smith responsibility for washing, fueling and repairing buses, work that Dykstra had historically participated in and continued to do to a diminished extent. First Student assigned the bus mainte-nance duties to Smith because he wanted the extra hours in order to have a full-time position. During the summer of 2001, First Student paid Smith $8 per hour to perform the washing, fueling and repairing work but only paid Dykstra $7 per hour for the same work. Sometime in the fall or early winter, First Student reduced Smith's rate of pay for this work to $7 per hour. According to First Student, Smith was initially paid at the $8 rate solely due to mistake; a mistake allegedly made by Laurie Sanborn. In response, Dykstra has offered Ms. Sanborn's affidavit, in which she states that it was Feugill who set the rate for Smith. Although Dykstra's introduction of Sanborn's testimony is not artful, because Dykstra does not set forth the substance of Sanborn's testimony in her responsive statement of material fact or in her statement of additional mate-rial fact,[6] I credit her testimony neverthe-less.

In November 2001, Laura Sanborn re-signed her position as Dispatcher at the Alton lot. First Student posted the posi-tion of dispatcher and asked that appli-cants apply by December 28, 2001. In the interim period before the position was filled, Dykstra, Hatch and Julian all filled

---

5. I draw this date from Exhibit A to the Declaration of David Brabender.

6. What Dykstra offers is this: "See the affida-vit of Laurie Sanborn which disputes the facts represented by the Defendant." This is not the way in which facts are supposed to be introduced in a summary judgment contest in this District. D. Me. Loc. R. 56. Ms. San-born's affidavit, consisting of a single page with only six terse averments, is apparently being offered to prove that Feugill set the rate of pay and that she did not do so by mistake.

in as dispatcher. Dykstra, Hatch and three unnamed female employees applied for the dispatcher position.[7] Feugill and Julian interviewed all the applicants save one woman who was interviewed by Julian alone. Hatch's interview was different from the other interviews in three respects. First, he was interviewed on a different day. Second, Julian[8] indicated that Hatch was interviewed at Feugill's office in Augusta, whereas the female applicants were all interviewed in Alton Third, Ted Leclerc (then vice president for the region) may have been present at Hatch's interview in addition to Feugill and Julian. Hatch received the position. According to First Student, Leclerc made the hiring decision and determined that Hatch was the most qualified candidate for the dispatcher position because of his previous experience as a dispatcher for a law enforcement agency. Also according to First Student, Leclerc considered Mr. Hatch's prior experience to make him better equipped to deal with pressured situations and better able to interact with people. Leclerc's decision was influenced by both Feugill and Julian, though the nature and quality of their input is not presented in the summary judgment record. According to Leclerc, he was not aware of any complaints by Dykstra that Feugill had

engaged in sex discrimination.[9] On this score, Dykstra once overhead a telephone conversation between Laura Sanborn and Feugill during which Feugill called Laura a "dumb bitch." In addition, Dykstra once overhead a meeting behind closed doors between Laurie Sanborn and Feugill where Feugill called Laurie Sanborn a "f'ing bitch." The conversations between Feugill and Laura and Laurie Sanborn were heated, resulting in Laura and Laurie Sanborn also raising their voices. According to the testimony of both Hatch and Julian, Feugill was a poor manager who would engage in loud arguments with both female and male employees. Hatch testified that Feugill also yelled at him.

In January 2002, Dykstra resigned her employment with First Student because she believed she had been demoted to a bus driving position while still being asked to take on other responsibilities, because she perceived a lack of equal pay for equal work and because Feugill swore at and berated women in the workplace. According to Dykstra, the final straw was when she was asked by Hatch for advice on whether or not he should force a bus driver to come to work who had a sick child at home. Dykstra felt that she should not have to be involved in those types of deci-

---

7. Dykstra testified that Hatch told her he was not going to apply for the job. Hatch's testimony is not inconsistent with this, but Hatch also testified that he changed his mind on the last day on which applications were being accepted. Hatch also testified that nobody at First Student encouraged him to apply for the position.

8. Hatch recalls being interviewed in Alton. I rely on Julian's testimony in this regard only because Dykstra finds it significant that Hatch's interview was in a different location.

9. In October 2001, Dykstra and other employees at First Student wrote a letter to Bruce Lyskawa, President of First Student, in which

they complained of Feugill's management. The letter, however, did not contain any allegations of discrimination on the basis of sex. Dykstra relates that she made an oral complaint about Feugill's treatment of women and her concern that Smith was being paid more to First Student's regional safety officer sometime in November 2001. According to Dykstra, Estes looked into Dykstra's complaints and told Dykstra that Smith was earning more money because he had a title. In any event, the record establishes that Smith's compensation for yard work was reduced that same month. Dykstra testified that nobody ever responded to her complaints about Feugill.

sions if she was only a bus driver and thus quit.

## Motion to Strike

Dykstra has moved to strike the Declaration of Fred Korte offered by First Student in connection with its summary judgment reply papers. The basis for Dykstra's objection is that the declarant did not provide a sufficient foundation for his testimony concerning certain business records. The declaration is cited only in First Student's reply to Dykstra's opposing statement of material facts (Docket No. 21), not in reply to Dykstra's statement of additional material facts (Docket No. 18).[10] Local Rule 56 does not permit a summary judgment movant to submit evidence in reply to a non-movant's response to the movant's statement of material facts, only in response to the non-movant's statement of additional material facts. D. Me. Loc. R. 56(d). Accordingly, I have disregarded the declaration at issue, along with the rest of First Student's reply to Dykstra's opposing statement of material facts, found at docket number 21. The motion is, therefore, GRANTED, striking both Korte's affidavit filed at Docket No. 22 and the pleading filed at Docket No. 21 in their entirety.

## Discussion

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-al fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *United States Steel v. M. DeMatteo Constr. Co.*, 315 F.3d 43, 48 (1st Cir.2002). A fact is material if its resolution would "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*

Dykstra raises the following complaints: (1) that she was demoted when First Student gave her the lead driver title, changed her pay to hourly and when Feugill told her that she was only a stupid bus driver; (2) that she was unfairly passed over when First Student increased Julian's supervisory duties to include both the Alton and Hampden locations; (3) that she received unequal pay for equal work when Smith was temporarily paid more than she was for yard maintenance work; and (4) that Hatch was hired for the dispatcher job over her because he is male. Additionally, Dykstra contends that the circumstances created a hostile work environment and that she was constructively discharged. Dykstra maintains that these allegedly adverse actions were motivated by discriminatory animus and that her working environment was unbearably hostile because (1) Feugill called her stupid, (2) Feugill called two other female employees bitches and (3) Feugill asked

---

**10.** Although they were filed separately in this case, there is no need for a non-movant to submit her additional statements of material facts separately from her opposing statement that admits, qualifies and denies the movant's statement of material facts. Local Rule 56(c), which governs the non-movant's "opposing statement of material facts" describes but a singular submission. I have also previously suggested, and indeed endorsed the practice, of numbering additional statements of fact consecutively to the movant's, rather than recommencing at 1. *Koken v. Auburn Mfg., Inc.*, 2004 WL 51099, *2 n. 6, 2004 U.S. Dist. LEXIS 496, *9 n. 6 (D.Me. Jan.9, 2004) (unreported recommended decision); *O'Meara v. Mineta*, 2003 WL 22282163, *1, 2003 U.S. Dist. LEXIS 17444, *4 (D.Me. Oct.2, 2003) (unreported recommended decision).

Dykstra "what all women were about—didn't she get it."

■ The parties are in agreement that the Court's resolution of the Title VII discrimination claims will also resolve Dykstra's Maine Human Rights Act claims. At the summary judgment stage, unless a Title VII plaintiff has direct evidence of discriminatory motive on her employer's part, her access to a trial depends on her performance in the *McDonnell Douglas* burden-shifting contest. *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir.1999); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The opening volley of this contest requires the plaintiff to demonstrate that she has a "prima facie case." *Id.* at 802, 93 S.Ct. 1817. As part of her prima facie showing, the plaintiff must demonstrate that her employer took an adverse employment action against her. *Rodriguez–Cuervos*, 181 F.3d at 19. Where the adverse action involves a discharge from employment or a failure to hire, the plaintiff must demonstrate that she was qualified for the position and that it remained open or was filled by someone with similar qualifications. *Id.* If the plaintiff succeeds in demonstrating a prima facie case, the burden shifts to the employer to produce[11] evidence of a legitimate, non-discriminatory justification for the adverse employment action. *Id.* If the employer fails to do so, summary judgment may not enter for the defendant. If, however, the defendant carries this burden of production, the plaintiff, who ultimately must provide evidence reasonably capable of exposing the defendant's stated justification as a mere pretext for discrimination, must show that the entirety of the record generates sufficient evidence for a reasonable fact finder to conclude that the employer was motivated by discriminatory animus. *Id.; McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. 1817. If the plaintiff cannot produce such evidence, summary judgment must enter against her claim. If the plaintiff carries this burden, she is deemed to have generated a genuine issue of material fact on the existence of discriminatory animus and the employer's summary judgment motion must be denied. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

First Student challenges whether Dykstra has made a sufficient prima facie showing with respect to some of the events she complains of. More specifically, First Student contends that certain of the events did not involve adverse employment actions. With respect to all events, First Student also argues that Feugill's rude statements are simply insufficient evidence to render pretextual any of its legitimate, non-discriminatory reasons for acting as it did. I address Dykstra's complaints one by one and then turn to her contentions regarding hostile work environment and constructive discharge.

■ To rise to the level of an adverse employment action, an action must materially change the conditions of the plaintiff's employment. *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir.2002). "Material changes include 'demotions, disadvantageous transfers or assignments, refusals to

---

**11.** Dykstra argues in her brief that First Student's evidence of a legitimate, non-discriminatory reason for an adverse employment action cannot be considered in the summary judgment contest unless it is uncontested. It is well settled that this is not the burden that *McDonnell Douglas* imposes on employers at the summary judgment stage. The employer's burden is merely a burden of production, not persuasion. *Rodriguez–Cuervos*, 181 F.3d at 19 n. 1.

promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" *Id.* (quoting *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998)). A decrease in pay is not required and "dramatically decreased supervisory authority" alone "could constitute an adverse employment action." *Id.* (citing *Marrero v. Goya of P.R.,* 304 F.3d 7, 23–24 (1st Cir.2002)). However, "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (cited and quoted with approval in *Marrero,* 304 F.3d at 23).

■ To expose the employer's legitimate, non-discriminatory reason for an adverse employment action as a mere pretext for discrimination, a plaintiff must adduce evidence reasonably capable of supporting a finding that the employer's reason is "unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Perhaps the most common way to do this is to present evidence that the employer's reason is false. In most cases,[12] such a finding, when coupled with the plaintiff's prima facie case, could reasonably support an inference on the part of the jury that the employer "is dissembling to cover up a discriminatory purpose." *Id.* at 147, 120

S.Ct. 2097 (indicating, "Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'," quoting *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).

■ Alternatively, even if the employer's legitimate, nondiscriminatory justification is sincere, the plaintiff may overcome summary judgment if she can show that the information the employer relied on was really discriminatorily-motivated misinformation supplied by one of the employee's supervisors. *Cariglia v. Hertz Equip. Rental Corp.,* 363 F.3d 77, No. 02–2199.01A, 2004 WL 720250, 2004 U.S.App. LEXIS 6423 (1st Cir. Apr.5, 2004) (vacating summary judgment where evidence suggested that the information on which the employer based its decision to terminate the plaintiff was actually misinformation supplied by the plaintiff's supervisor, who had made numerous statements reflecting discriminatory animus).

### 1. The alleged demotion

■ According to Dykstra, "The nature of [her] employment, as a supervisor/lead driver/bus driver, is a fact that pervades the various claims for relief here and is *a disputed material fact.*" (Memo. in Opp., Docket No. 19, at 3.) According to Dykstra, because she testified that she served Champion as a supervisor of the Glenburn lot, she must have been demoted

---

12. An inference of discriminatory purpose is not necessarily reasonable in every such case:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment

as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves,* 530 U.S. at 148, 120 S.Ct. 2097.

and summary judgment must be denied. (*Id.* at 4.) This argument jumps the gun, to say the least. The evidence adduced by the parties in their statements of material fact reveal that Dykstra did not have a title while employed by Champion, but had some supervisory/administrative responsibilities over her fellow drivers that went beyond mere bus driving. Under First Student, Dykstra received her first title: lead driver. This evidence simply does not support the contention that First Student reduced Dykstra's title. With respect to the more germane issues of Dykstra's responsibilities and pay, the record reveals that although First Student changed Dykstra from a salaried to an hourly employee, Dykstra's pay actually increased during her employment with First Student on account of overtime. Furthermore, the record reveals that First Student continued to expect Dykstra to perform the same supervisory and administrative duties for the Alton lot and paid her overtime for that work, despite the fact that Feugill's communications with Dykstra caused her to temporarily stop performing these duties. I conclude that the temporary suspension of Dykstra's supervisory and administrative duties at the Alton lot was not an adverse employment action because it was only a temporary suspension that did not materially change the conditions of her employment. Although Dykstra may have been justified to discontinue performing her supervisory duties at the Alton lot based on Feugill's characterization of her as just a "stupid bus driver," Dykstra was soon instructed to take them up again and she was provided with additional compensation to perform them. Even if Feugill expected Dykstra to perform her supervisory duties without receiving additional pay, an inference that might be permitted, the record does not establish that Dykstra ever reported fewer hours than she actually worked or that First Student ever withheld payment for Dykstra's performance of these duties.[13] No reasonable jury could conclude that this was more than a mere inconvenience or an alteration of job responsibilities.

## 2. The alleged passing over

According to Dykstra, "a supervisory position opened up which was similar to what she had been doing in Glenburn and it was not advertised but given to a male [Julian] who had been doing the same job of supervision she had been doing." (Docket No. 19 at 4.) Here she refers to First Student's elimination of Harry Sanborn's supervisory position in Alton and the reassignment of Sanborn's former duties to Julian. Dykstra argues that she

---

**13.** Dykstra's deposition transcript reads as follows:

Q. So after meeting with [Feugill] where you discussed your change from hourly—from salary to hourly, you stopped doing the job duties you had done previously?
A. Yes, I did. And so then I would be asked from people at the office where is this or where is this or—the week that we ran out of fuel, well, why didn't you tell us? Well, I don't do that anymore. They found that what I did had a meaning and . . .
Q. And at that point did Mike Julian ask you to start taking some of those responsibilities back?
A. Yes, he did.
Q. And you got paid for doing those job duties; is that correct?
A. Yes. I received overtime for those duties, and that still kept Jason complaining every week.

(Docket No. 12, Ex. 2, at 52.)

should have been considered for this position because she had previously performed the same job as Julian. The problem with this argument is that the facts do not demonstrate that Dykstra and Julian had the same job to begin with. Among other significant differences, Dykstra was primarily a bus driver. Julian was not. Julian also worked out of an office environment. Dykstra's only "office" was her bus. Julian had some 10 years of supervisory experience in the industry before joining this company. Dykstra does not allude to any similar experience. Julian's position as supervisor of the Hampden lot was comparable to the position of Laura Sanborn, who supervised the Alton lot. Dykstra reported to Laura Sanborn, reflecting a further distinction in rank between Julian and Dykstra. Further undermining Dykstra's contention is her failure to cite a single case addressing the issue of whether and when the elimination of a third party's position, combined with the restructuring of another third party's position amounts to an adverse employment action for an unrelated employee. I conclude that the summary judgment record does not reasonably support a finding that Dykstra suffered an adverse employment action when the Alton supervisory position was eliminated and folded into the Hampden supervisory position.

### 3. Unequal pay for equal work

The record reflects that for a period of time between August and November 2001, First Student paid a male employee $8.00 per hour for certain maintenance work, while paying Dykstra $7.00 per hour when she performed the same work. Receiving less pay for equal work is actionable under Title VII, among other federal statutes. See Rathbun v. Autozone, Inc., 361 F.3d 62, 72–73 (1st Cir. 2004) (discussing difference in summary judgment burdens under the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Title VII). First student's only challenge to Dykstra's ability to show a prima facie case involves an argument that she could not have been subjected to wage discrimination because she did not perform substantially the same work as Smith once Smith was hired. Even if there is any merit in the suggestion that an equal pay theory cannot go forward unless Dykstra and Smith were working the job at the same time, Dykstra's own testimony is to the effect that she continued to perform maintenance duties after Smith was hired.[14] Thus, we turn to First Student's burden of production. The legitimate, non-discriminatory reason that First Student offers for why it paid Smith more than Dykstra is that a clerical error was made by Laurie Sanborn. This assertion is supported by competent evidence. Thus, the burden returns to Dykstra, who must produce evidence of pretext. Dykstra succeeds in this endeavor with the Affidavit of Laurie Sanborn. In her affidavit, Sanborn denies that she had the authority to establish Smith's compensation level and further avers, based on her knowledge, that Feugill set the rate by which Smith would be compensated for maintenance

---

**14.** There is a question of whether the *McDonnell Douglas* framework should be applied to unequal pay claims brought under Title VII. *Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 8 n. 11 (1st Cir.2000) (reserving that issue for later consideration). The parties have not suggested otherwise and, because the claim has been briefed only in the context of the *McDonnell Douglas* burden shifting framework, I evaluate Dykstra's claim according to that methodology. *See Rathbun,* 361 F.3d at 73 (using the *McDonnell Douglas* framework where the plaintiff "acquiesced in [that] mode of analysis"). Because First Student does not challenge it, I assume that Smith's receipt of higher pay constitutes an adverse employment action for Dykstra.

work. One permissible inference that can be drawn from this testimony is that Feugill directed Sanborn to designate an $8.00 per hour pay rate for Smith's performance of maintenance duties. This evidence is sufficient to generate a genuine issue as to First Student's veracity with respect to the reason for Dykstra's receipt of unequal pay. In sum, a jury could reasonably find that Feugill, thinking women "don't get it," paid a male employee more to perform the same maintenance duties. Coupled with the possible finding that First Student is dissembling to cover up a discriminatory purpose with its "clerical error" explanation, there is sufficient evidence in this record to support a finding of unlawful sex discrimination.

### 4. Denied promotion

█ The primary adverse action upon which Dykstra bases her claim of discrimination concerns her application for the dispatcher job. First Student does not challenge Dykstra's ability to establish a prima facie case on this point. As justification for its decision to hire Hatch over Dykstra, First Student offers that it considered Hatch to be the better candidate and it properly supports this contention with a sworn statement from Edward Leclerc, the individual who made the hiring decision. Thus, it falls to Dykstra to expose First Student's stated reason as a mere pretext for discriminatory purpose. The facts reflect that Dykstra, three other female employees and Hatch applied for the dispatcher position and that Hatch, the only male applicant, was hired to the position. In support of its legitimate, nondiscriminatory reason for hiring Hatch, First Student alludes to Hatch's 20 years as a patrol sergeant, during which time he supervised dispatch and worked doing dispatch as well. In response, Dykstra asks, rhetorically, "Would it be reasonable for a jury to find that Mrs. Dykstra's experience in the context of the Champion and First Student experience was equal to that of Mr. Hatch?" Her answer: "Given the fact that they were both fill-in dispatchers for Laura Sanborn, the answer should be 'yes'." (Docket No. 19 at 7.) Dykstra poses another rhetorical question on the heels of this, asking, "Is there also an issue of credibility in the interview process in terms of gender based equality of treatment of Mrs. Dykstra and the other female candidates for the dispatcher job in terms of before whom the job interview was conducted, when and where it was conducted in order to raise credibility issues for a jury." (*Id.*) Dykstra's answer: "[H]opefully the Court will agree that the answer is 'yes' and that Plaintiff has carried her pretext burden." (*Id.*) I conclude that, although these are appropriate "veins of circumstantial evidence that may be mined," *Mesnick v. G.E.*, 950 F.2d 816, 824 (1st Cir.1991), they are not sufficiently weighty to generate a genuine issue of material fact concerning the existence of pretext.

█ When an employer justifies a hiring decision based on the successful applicant's qualifications, exposing pretext requires a greater showing than that the plaintiff was equally qualified. "In a rare case, the disappointed applicant may be able to prove pretext by showing that she was in fact *better* qualified than the individual selected. But that is an uphill struggle: in the absence of strong objective evidence (*e.g.*, test scores), proof of competing qualifications will seldom, in and of itself, be sufficient to create a triable issue of pretext." *Rathbun*, 361 F.3d at 74 (emphasis added). The evidence presented by Dykstra does not support a conclusion that she was better qualified than Hatch or even equally qualified as he; only that she was at least qualified to perform the duties of the dispatcher position. This

leaves the fact that Hatch was interviewed on a different date, in a different location and with a higher level of management present. These aspects of Hatch's interview tend to show that First Student afforded preferential treatment to Hatch, but they do not reveal that it did so due to sex- or gender-based animus. Like the fact of his hiring, preferential treatment during the interview process is entirely consistent with the fact that Hatch was viewed as having greater qualifications. The mere fact that the only male applicant was hired is not evidence of pretext when the record does not contain evidence undermining the assertion that he had greater qualifications or capable of supporting a finding that Dykstra had better qualifications. As for the possible implications of *Cariglia,* which issued while this summary judgment motion was under advisement, there is no evidence, let alone argumentation, that Feugill infected the hiring decision with discriminatory animus such as by misrepresenting any aspect of Dykstra's capabilities, work history or other qualifications.

*5. Hostile work environment and constructive discharge*

Dykstra raises hostile work environment in her summary judgment memorandum, but no such cause of action is expressly stated in her complaint. Nevertheless, Dykstra did allege in her complaint a broad count for relief captioned "Title VII" and requested, among other relief, reinstatement and front pay. In my view, Dykstra alleged enough to place First Student on notice that her case would include hostile work environment and constructive discharge claims. Nevertheless, Dykstra's arguments on these aspects of her case are not easy to follow. Essentially, Dykstra argument is limited to the summary judgment standard; she argues that I cannot act as the trier of fact in determining this

dispute. I am fully aware of the role a court plays at the summary judgment stage of civil litigation and assure Dykstra that I have striven to avoid any usurpation of the jury's role. Beyond this argument, Dykstra does virtually nothing to explain, in context, how Feugill's statements generated a pervasively hostile, intolerable work environment, essentially leaving it for me to research the relevant precedents and measure her case against them.

Having already concluded that Dykstra has not demonstrated that animus toward women motivated the major workplace events that she complains of, I next consider whether the sum total of her experiences at First Student, combined with Feugill's various rude and obnoxious remarks, generated a work environment sufficiently humiliating or abusive to effectively alter the terms and conditions of her employment (hostile work environment) or "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign" (constructive discharge). *Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 28 (1st Cir.2002). Lest there be any doubt, the second standard sets the higher bar. *Id.* What the evidence reflects is that Feugill told Dykstra that she was a stupid bus driver and asked her "what all women were about—didn't she get it." Only the second of these two statements concerned Dykstra's sex. Beyond this singular statement to her, Dykstra points to two incidents in which Feugill called other women in the workplace bitches. Neither of these insults were directed at her. The record reflects that Feugill often yelled at male employees as well, though there is no evidence of comparable epithets being thrown at men.

The question of whether a supervisor's harassment was so "severe or pervasive" as to change the conditions of employment

"must be answered by reference to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 18 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In my view, Feugill's statements were not sufficiently severe to generate a genuine issue of material fact on the existence of a hostile work environment. The only statement that arguably humiliated Dykstra, and the one she draws the most attention to in her memorandum, was the statement that she was just a stupid bus driver. This statement did not even concern her sex. The remaining statement, to the effect that women do not "get it," cannot reasonably be viewed as so severe that it changed the conditions of her job. Nor is it reasonable to infer, without more evidence and explanation, that the statements Feugill made to Laura and Laurie Sanborn in the Alton office environment somehow changed the conditions of Dykstra's job. Dykstra was not called a bitch and Dykstra also did not work out of the Alton office on a regular basis. Feugill, for that matter, worked out of an office in Augusta and there is no basis in the record to conclude that Dykstra even encountered him on a regular basis. To whatever extent Feugill's statements to the Sanborn women might have changed the office environment in Alton, a reasonable jury could not conclude from this record that the insults the Sanborn women endured created a *pervasively* hostile environment for Dykstra or subjected her to severe harassment. Finally, there is no evidence that Feugill's statements interfered with Dykstra's performance of her duties.

The conclusion that Dykstra has not made out a hostile work environment claim effectively disposes of Dykstra's constructive discharge claim as well. *Hernandez–Torres v. Intercontinental Trading*, 158 F.3d 43, 48 (1st Cir.1998) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992)) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").

### 6. Retaliation

██ Unlike her hostile work environment claim, Dykstra's retaliation claim is clearly pled in her complaint. However, her summary judgment memorandum of law offers no argument in opposition to First Student's contention that there is no evidence of retaliation. I treat this as a waiver. *Grenier v. Cyanamid Plastics*, 70 F.3d 667, 678 (1st Cir.1995) ("An issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Green v. New Balance Ath. Shoe, Inc.*, 182 F.Supp.2d 128, 136 (D.Me. 2002) ("Although Plaintiff makes much of [a workplace] slight in her statement of material facts, she fails to press any argument about its legal significance in her brief. Any claim arising from this occurrence is therefore deemed waived.").

### 7. Whistleblower protection

In its motion for summary judgment, First Student argues that Dykstra bases her whistleblower claim on the same facts as her retaliation claim. In response, Dykstra "agree[s] with the Defendant that the Whistleblower claims [15] are analyzed in a manner similar to the Title VII claims and if the Title VII claims survive the Motion for Summary Judgment, so do

---

15. Dykstra actually alleges but one whistleblower claim in her fifth count.

those claims." I treat Dykstra's failure to articulate the basis for this claim as a waiver.

### Conclusion

For the reasons stated herein, Defendant First Student's Motion for Summary Judgment is **GRANTED, IN PART**. Judgment will enter for the defendant on all of the plaintiff's claims except for the equal pay component of Counts I and II.

*So Ordered.*